UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES F. CORCORAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.  11-11001-FDS |
| STEVEN J. O'BRIEN, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION ON
## PETITION FOR WRIT OF HABEAS CORPUS

February 14, 2014

DEIN, U.S.M.J.

## I.  INTRODUCTION

James F. Corcoran has brought a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 challenging his conviction on October 22, 2008 for breaking and

entering a building in the daytime in order to commit a felony, in violation of Mass. Gen.

Laws ch. 266, § 18.  He was subsequently determined to be a career offender, and sen-

tenced to 10 years of incarceration.  Corcoran's conviction, and the denial of his motion

for a new trial and renewed motion for a new trial, were affirmed by the Massachusetts

Appeals Court in an unpublished opinion on November 19, 2010.  Commonwealth v.

Corcoran, 78 Mass. App. Ct. 1110, 937 N.E.2d 522 (table), No. 09-P-494, 2010 WL

4676187 (Mass. App. Ct. Nov. 19, 2010).[1]

---

[1]  The text of the decision is found only in the Westlaw version.

In his habeas petition, Corcoran asserts that "[t]he pre-trial identification of the defendant was inherently and impermissibly suggestive in violation of the defendant's due process rights[.]" (Pet. (Docket No. 3) at Ground One). In his memorandum in support of his petition (Docket No. 18-1), Corcoran argues that the findings of fact made by the motion judge in denying his pre-trial motion to suppress were clearly erroneous, as they were based on testimony about the witness's opportunity to observe the perpetrator that was allegedly dispelled at trial. In addition, he challenges the state trial and appellate courts' rulings, which he contends failed to allow for the reconsideration of the denial of the motion to suppress despite new evidence.

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the habeas petition be DENIED. Corcoran has failed to establish that the state court decisions refusing to suppress the out-of-court identifications were contrary to or an unreasonable application of Federal law, even accepting his interpretation of the trial testimony as being true. Furthermore, Corcoran's contention that Massachusetts law precludes the consideration of new evidence in connection with a motion to suppress is not supported by the law or the factual record of this case. Rather, the evidence developed at Corcoran's trial relative to his motion to suppress was con-sidered by the state courts in connection with his motion for a new trial and renewed motion for a new trial.

## II.  <u>STATEMENT OF FACTS</u>[2]

### <u>Prior Proceedings</u>

Corcoran was indicted on August 7, 2007 by a Middlesex County grand jury for breaking and entering in the daytime with intent to commit a felony, in violation of Mass. Gen. Laws ch. 266, § 18.  (SA 3, 8).  He was also charged as an habitual offender in violation of Mass. Gen. Laws ch. 279, § 25.  (<u>Id.</u> at 3).  Following a jury trial, he was convicted on October 22, 2008 of the breaking and entering charge.  (<u>Id.</u> at 5).  Corcoran then waived a jury trial on the habitual offender charge and, after a separate jury-waived trial, was convicted on October 31, 2008 of being an habitual offender.  (<u>Id.</u>).  He was sentenced to 10 years of imprisonment.  (<u>Id.</u>).  Corcoran filed a timely appeal.

Prior to trial, Corcoran filed a motion to suppress the out of court identification made by an eye witness, Kellie Quinn, on the grounds that it was "the product of a constitutionally impermissible suggestive photographic identification procedure."  (SA 123).  A hearing was held before Sandra L. Hamlin, Justice of the Superior Court, on February 14, 2008.  (SA 379).  Framingham Police Officer Stacy Macaudda, who responded to the call reporting a break-in, and Detective Lawrence Hendry, who investigated the crime, testified.  (SA 382, 425).  Following the hearing, Judge Hamlin issued written "Findings of Fact, Rulings of Law and Order on Defendant's Motion to Suppress Photographic Identification" and denied the motion to suppress.  (SA 128-37).

---

[2]  The record below is found in the Respondent's Supplemental Answer ("SA"), filed as Docket No. 11.

As detailed <u>infra</u>, one of the three girls who reported the break-in, presumably Kellie Quinn, had identified Corcoran at the time of the incident when his Registry of Motor Vehicles' photograph appeared on Officer Macaudda's cruiser's computer screen while she was running potential license plates of the vehicle in which the intruder had left the scene. (SA 135). Hours later, the same photograph was included in an eight person photo array, at which time Kellie again picked Corcoran's picture. Corcoran contends that Kellie was, in fact, simply identifying the same photograph she had seen previously. In rejecting this argument, Judge Hamlin found, <u>inter alia</u>, that Kellie had had two opportunities to view the defendant before making any identification, and that her identification at the time of the initial viewing was definitive.

Corcoran contends that Kellie's trial testimony established that she did not, in fact, have the opportunity to observe the defendant before identifying his photograph, and that her pre-trial identification was not as definitive as the Judge had found. After obtaining a stay of his appeal so that he could pursue this issue, on May 20, 2009, Corcoran filed a motion for a new trial in Middlesex Superior Court. (SA 54, 7). Therein, he claimed that defense counsel was ineffective for failing to move for reconsideration of the suppression motion, and for failing to call witnesses to testify at the suppression hearing. (<u>See</u> SA 138, 142). The trial judge denied the motion for a new trial, and Corcoran appealed. (SA 7, 151-163). On November 17, 2009, Corcoran filed a renewed motion for a new trial to be heard by the motion judge, Judge Hamlin. (SA 165). Judge Hamlin promptly denied the motion and Corcoran appealed. (SA 8).

The Massachusetts Appeals court, in an unpublished memorandum and order pursuant to Rule 1:28, affirmed Corcoran's convictions and the orders denying his motions for a new trial.  Corcoran, 2010 WL 4676187.  He then filed an application for leave to obtain further appellate review with the Massachusetts Supreme Judicial Court.  This petition was denied on February 9, 2011.  (SA 377).  See Commonwealth v. Corcoran, 459 Mass. 1101, 942 N.E.2d 182 (table) (2011).  This timely habeas petition followed.

### Facts Developed at the Suppression Hearing

As noted above, Officer Macaudda and Detective Hendry of the Framingham Police, testified at the hearing on Corcoran's motion to suppress.  Briefly, Judge Hamlin made the following findings of fact.

On June 14, 2007, Framingham Police Officer Stacy Macaudda was on patrol when she received a radio call around 10:00 a.m. for a report of suspicious activity at a home in Framingham.  (SA 128).  Upon her arrival, three teenage girls were waiting in front of the house: Kellie Quinn, Chelsea W. and Ariel S.[3]  (SA 128-29).  Chelsea, who lived at the house, told Officer Macaudda that when she came home from school with her friends she noticed an unfamiliar pickup truck in her driveway.  (SA 129).  The truck was older, and bluish gray in color.  (Id.).  Chelsea and her friends went into the home through the basement door, and she called out "Hello, Hello," because she knew her two sisters were sleeping upstairs.  (Id.).  Chelsea heard footsteps upstairs which were moving

---

[3] Since the Massachusetts Appeals Court cited Kellie Quinn's name in full, this court will similarly identify her.  Judge Hamlin used only first names and last initials in her Findings of Fact.

fast.  (Id.).  The girls were spooked and started back toward the basement door when they

saw through the glass top of the basement door they had entered a male leaving the home,

walk down the driveway, get into the pickup truck and drive away.  (Id.).  One of the girls

entered the license plate of the truck into her cell phone, which she recorded as 14K483.

(Id.).  The man was described to Officer Macaudda as a white male, approximately 50

years old, 6 feet tall, greyish hair and a moustache, wearing khaki shorts and a striped

polo shirt.  (Id.).  The girls were very excited and surprised someone was in the house.

(Id.).  Officer Macaudda checked the home to make sure everyone was safe, and that

there were no other intruders inside.  (Id.).

Officer Macaudda knew that the license plate number the girls had given her was

not the usual combination in Massachusetts, except if it was a vanity plate.  (Id.).

Usually there were two letters in the middle.  (Id.).  Consequently, Officer Macaudda

asked the girls if they were sure, or if there could be other options.  (Id.).  One of the girls

gave her some options, but Officer Macaudda did not know which of the girls did so.

(Id.).

Judge Hamlin described the subsequent events as follows.  Since they form the

crux of Corcoran's habeas petition, they will be quoted in full:

> Macaudda sat in the driver's seat of her cruiser and randomly began
> entering combination letters to try to determine the license plate of
> the truck.  She first entered what the girls gave her (14K483) without
> success.  As she randomly entered different letters for the 4, one of
> the girls was standing by the cruiser talking to her.  Macaudda was
> not talking to the girl.  She did not know which girl was there nor
> had she asked her to stand there.  The other two girls were at the

other end of the driveway talking with the officer she was training, but were not near the cruiser.

After entering the license the girls had given her (14K483), she entered 14KA83.  As a license plate is entered, a description of the vehicle comes up on the laptop screen as well as the registered owner's photograph.  This combination involved a sedan not a truck so she moved on to 14KF83 which also did not match a truck.  As she was entering these variations the girl standing outside the driver's door was talking to her, but Macaudda was not aware of her observing the laptop.  To run each variation took about 10 seconds.

The next combination she ran was 14KH83.  When the screen revealed the Registry of Motor Vehicle photograph, the girl standing beside the cruiser spontaneously said "that's him, his hair is shorter but that's him."  The vehicle information was for a 1988 blue/grey Chevy pickup truck.  The registered owner was the defendant.

Macaudda immediately closed the laptop when the girl said "that's him" and told her she would have to view a photographic array and speak to the detectives.  Macaudda never asked her to identify any photograph.  The defendant's photograph was on the laptop for five seconds or less before the girl said "that's him."  From the time that she first received the radio call until she ran the four variations was only a few minutes at the most.  Events happened quickly. Macaudda was engaged in investigatory police work trying to trace down a suspect.  She was in no way conducting any photographic identification procedure or show up.  That was never her intent.  Any viewing of the defendant's photo by the girl near her cruiser was accidental and unintentional, as evidenced by the fact that she immediately closed the laptop.  At no time did she ask the girl any questions, nor did she show the defendant's photograph to the other two girls.  Her focus was on running the variations.  While Macaudda was running the sequences she was having dispatch run other sequences as well.

(SA 129-31).

Officer Macaauda testified further that the three girls were all talking to her about what had happened, the description of the man and the license plate.  (SA 131).  She had

no memory of which girl said what specifically.  (Id.).  The girls were going with their

class to Six Flags for an end of the school year outing, so no further identification was

made at that time.  (Id.).

     In accordance with their usual procedure, the case was taken over by Framingham

Police Detective Lawrence Hendry, who did not discuss the case with Officer Macaudda.

(Id.).  During his evening shift, at around 8:30 p.m., Officer Hendry spoke to each of the

three girls separately and asked them to come down to the police station, which they did.

(Id.).  Officer Hendry testified that he interviewed Kellie Quinn first.  Since this testi-

mony is critical to Corcoran's habeas petition, Judge Hamlin's findings about this

testimony will be quoted in full herein.

> Around 9:00 p.m. at the police station he first spoke to Kellie Q.
> who was sixteen and a junior in high school.  Kellie told him she and
> her two friends Chelsea W. and Ariel S. left school around 9:30 a.m.
> preparing for the Six Flags trip.  Ariel was driving.  When they got
> to Chelsea's house she saw a truck backed into the driveway.  They
> parked to the right side of the truck and entered the house by a
> locked basement door on the left side of the house which they
> opened with a key hidden outside.  They called out "Hello, Hello"
> and went toward the stairway leading from the basement to the main
> floor.  There was no response but Kellie said she heard heavy
> footsteps.  They were spooked and began going back towards the
> basement door where they had entered.
>
> At this point Kellie observed through the glass top of the basement
> door (Exhibit 3) a man coming from the backyard area (Exhibit 2).
> He walked right by the basement door (Exhibit 3) on the left side of
> the house down the driveway.  (Exhibits 1 and 2).  She said to the
> other girls she saw someone and they all went to the front basement
> window which looks out onto the front driveway where the truck and
> Ariel's car were parked.  (Exhibits 4 and 1).

Kellie said the same man she had seen walking by the basement door got into the pickup truck in the driveway. Chelsea was shouting the plate out and Kellie programmed it into her cell phone. Hendry took pictures of the cell phone entry of 14K483. Kellie described the truck as an older style pickup truck, that was blue and grey. She described the man she saw as a white male, in his early fifties, average height, overweight with short fuzzy greyish type hair and a grey moustache. He was wearing tan khaki shorts, and a blue and white striped polo shirt.

Hendry had compiled a photo array of eight similar individuals (Exhibit 6). The photographs were black and white. The defendant's Registry of Motor Vehicles photograph was included. The photographs were xeroxed and on one sheet. He explained to Kellie that he wanted her to look at a photo array. Before he showed her the photo array he went over with her a form entitled "Photo Array - Identification Checklist.["] The time as noted was 9:15 p.m. on June 14, 2007. There were eleven advisements and he read them to Kellie checking each one as he did. ... Advisement number 2 is the person who committed the crime may or may not be included, so you should not feel compelled to make an identification. Among other advisements Kellie was told to take as much time as she needed and she should think back to the time of the event, the place, the view, lighting, her frame of mind, etc. (number 7), that the officer could give her no feedback or comment on the results of the process (number 5), that it was as important to clear innocent people as to identify possible perpetrators (number 3), that people may not appear exactly as they did at the time of the event, because features such as clothing and head/facial hair are subject to change (number 8), and that she should not discuss the identification procedures or the results with other witnesses in the case or the media. Kellie was also advised if she identified someone, to place her initials and the date below the photo, clearly marking her selection. Both Hendry and Kellie signed the form (Exhibit 5).

Hendry placed the photo array (Exhibit 6) in front of Kellie. Eight photos were on one page – four on the top and four on the bottom. She made a very quick identification and put her initials and the date under the defendant's photograph which was in the bottom row third from the left. She said this was the person she saw at the house. Hendry did not recall if he asked her how sure she was.

He interviewed Ariel but did not show her the photo array because she said she did not get a full look at the person.

He interviewed Chelsea but did not show her the photo array because she said she only saw the back of the person. She never had a facial view.

The pickup truck was found within a day or so and identified as the vehicle that had been at 193 Winter Street. A photograph of the license plate – 14KH83 – shows that the H was partially blocked by a trailer hitch and could have appeared to be a 4. (Exhibit 7).

At some point, Hendry was not sure whether it was the same day of the incident or another day he went to 193 Winter Street and entered the house. He identified the basement door the girls had entered on the left side of the house with the glass top (Exhibit 3) as well as the basement window the girls looked out and saw the man. (Exhibit 4). The view of this window is of the driveway in the front of the house. The basement window is also the lower left window on the front of the house partially blocked by the police car. (Exhibit 1).

(SA 131-34 (footnote omitted)). Judge Hamlin then made the following findings which

Corcoran contends are inconsistent with Kellie's trial testimony:

Kellie had two adequate opportunities to see and identify the defendant. The first was through the glass top of basement door as he walked by (Exhibit 3). The second was when she went to the basement window, jumped up on the couch and saw him in the driveway and then getting into his truck. (Exhibits 4 and 1). Her view was unobstructed.

The weather was clear and it was broad daylight. She gave an excellent detailed description of the defendant and of his truck. If she was the girl by Macaudda's cruiser, any chance, accidental viewing of the defendant's photograph on the laptop was extremely brief (less than 5 seconds), and did not influence her identification at the photographic array. Macaudda at no time was conducting any identification procedure as evidenced by her immediately closing the laptop and telling the girl she would have to view a photo array and

talk to the detectives.  This action clearly communicated to the girl
that a procedure was to be followed.

Hendry's photograph array was a fair group of eight similar
individuals with similar features.  It was conducted in a fair and
appropriate manner without pressure or suggestiveness by Hendry in
any way.  The fact that a blind presenter was not used in no way
affected the fairness and appropriateness of the identification
procedure in this case.

Assuming arguendo, which the Court does not find, that a viewing of
the defendant's photograph on the laptop was unnecessarily sugges-
tive, and that Kellie was the girl, Kellie's identification of the defen-
dant from the photographic array was based upon her observations of
the defendant during the two opportunities she had to see him at 193
Winter Street around 10:00 a.m. on the morning of June 14, 2007.

(SA 134-35).

In ruling on the motion to suppress, Judge Hamlin cited to <u>Commonwealth v.</u>

<u>Martin</u>, 447 Mass. 274, 279-80 (2006), and ruled that "[i]n order to suppress the

identification, Corcoran must show by a preponderance of the evidence, in light of the

totality of the circumstances, that identification was so unnecessarily or impermissibly

suggestive and conducive to irreparable misidentification as to deny him due process of

law."  (SA 135).  She rejected Corcoran's contention that the viewing of his photograph

on Officer Macaudda's cruiser's computer screen was an impermissibly suggestive one-

on-one identification, citing to the fact that the Officer had entered several license plates

on the computer before the identification, and the witness spontaneously identified

Corcoran only after several other images had been displayed on the computer.  (<u>Id.</u>).  In

addition, Judge Hamlin relied on the fact that the Officer "was not conducting any

-11-

photographic identification or show up procedure[,]" and that any viewing of the defendant's photograph by the witness was "accidental." (Id.).  Judge Hamlin also found it significant that the investigation of the potential license plates had begun only minutes after the event occurred, and there was not time to assemble an array for the witness to view without running the risk that other images would distract the witness.  (SA 135-36).  Finally, Judge Hamlin ruled that the photographic array at the police station "was fair and not impermissibly suggestive."  (SA 136).  Not only did Officer Hendry review the checklist form, but the array also "contained eight black and white photographs of similarly looking individuals, each photograph was similar in shape and size, and Corcoran's picture did not stand out from the others."  (Id.).  Kellie selected the photo, according to Judge Hamlin, "without any outside influence[.]"  (Id.).  Under such circumstances, Judge Hamlin ruled that Corcoran "has failed to show by a preponderance of the evidence that either the accidental confrontation or photographic array was so impermissibly suggestive as to give rise to any likelihood of misidentification or any suggestiveness that would violate due process."  (SA 136-137).

**Kellie's Trial Testimony**

Corcoran contends that Kellie's trial testimony contradicts Judge Hamlin's findings and that the judge's findings were clearly wrong.  As detailed herein, however, any differences do not warrant the suppression of the photo identification.

Corcoran first challenges Judge Hamlin's conclusion that the witness's viewing of Corcoran's image at the scene was "accidental."  (Pet. Mem. at 16).  In support of his

contention, he cites to trial testimony to the effect that the witnesses knew that the officer was going to try and "trace the license plate number Chelsea had seen" and that the girls stood by the cruiser watching the officer trying to find a vehicle with a plate matching the one the witnesses had seen, and then bringing up the Registry of Motor Vehicles license photographs.  (Id.).  Thus, Corcoran argues, "[t]he factual conclusion that the confrontation was accidental was simply wrong.  The confrontation was caused by the officer searching for a suspect with the aid of the eyewitnesses and allowing them to watch over her shoulder as she displayed photographs on her laptop."  (Id.).

Corcoran also challenges Judge Hamlin's factual finding that Kellie had two opportunities to view the intruder before she identified the photograph.  (Pet. Mem. at 17).  Thus, he cites to Kellie's trial testimony to the effect that she did not see the man "front on," and only saw a "side profile view" of him through the basement window for "a second."  (Id.; SA 657, 671-73).  She also testified that she didn't go "all of the way over to the window" despite the judge's finding to the contrary.  (SA 674).  Rather, according to the trial testimony, Chelsea went to the window and Kellie put the numbers Chelsea called out into her phone.  (Id.).

Corcoran also challenges the motion judge's finding that Kellie identified the photograph of the defendant at the scene by saying "that's him, his hair is shorter but that's him."  (Pet. Mem. at 18; SA 130).  At trial, Kellie testified that she had said "it could have been the man that had walked by the house, but I did not see him front on, so there was no way for me to be a hundred percent sure."  (SA 657).

Corcoran also cites to Kellie's testimony regarding whether she had selected anyone from a photo array. (Pet. Mem. at 9). First she testified that she "recognized the same person I had seen on the police cruiser's screen which I said —." (SA 660). After objection by defense counsel, she testified that she selected from the photo array "[t]he man I had seen walking along Chelsea's house, and getting into the truck." (SA 661).

Finally, at trial Kellie was asked if "the individual you think you saw walking by the door and the windows on June 14, 2007, while you were at Chelsea Watson's home" was in the courtroom. (SA 670). Kellie testified that she "cannot be sure if I see that person in the courtroom today[,]" but identified Corcoran as someone who "resembles that person[.]" (Id.).

## Motion for a New Trial

Following his conviction, Corcoran filed a motion for a new trial arguing ineffective assistance of counsel based on counsel's failure to present evidence at the hearing on his motion to suppress, and counsel's failure to renew the motion to suppress during trial. (See SA 142). The trial judge denied the motion, issuing a "Memorandum of Decision on Defendant's Motion for New Trial." (SA 152-63). After reviewing Judge Hamlin's findings and the discrepancies on which Corcoran relied,[4] the trial judge

---

[4] As the trial judge ruled, "the defendant significantly overstates the case as to the impact of the trial testimony. Stripped of those portions of his argument which essentially attack the basis of the motion judge's ruling, the defendant points to one piece of evidence that emerged at the trial: that the trial testimony, from Kellie herself and from Macaudda, identified Kellie as the person who had viewed the computer screen at the cruiser." (SA 161).

concluded that the differences were "not so strongly material as suggested by the defen-

dant." (SA 162).  Rather, according to the trial judge, it "does not appear to be the sort of

evidence which would have altered the conclusion reached by the motion judge in

denying the motion to suppress." (Id.).

Further, the trial judge concluded that it was not ineffective assistance of counsel

not to have called Kellie as a witness at the suppression hearing.  As he concluded,

having Kellie testify would have given her "a 'dry-run' in a court room setting of

testimony which related to the events of the day of the break-in, and most especially to

her identification.  Her testimony would be taking place at a point in time, nearer to the

date of the incident than the trial, when her memory of events might be fresher.  Calling

her at that hearing would present the more than plausible prospect of firming up a

confirmation of the identification of the defendant which she had made at the police

station at the time of the photo array presentation." (SA 159).   In fact, as the trial judge

noted, it was a logical strategy given Kellie's uncertain identification at trial, which

allowed trial counsel to argue "that reasonable doubt existed as to the identity of the

defendant as the perpetrator." (SA 160).

### The Renewed Motion for a New Trial

Corcoran appealed from the denial of his motion for a new trial, and filed a

renewed motion for a new trial with the motion judge.  (SA 165).  According to

Corcoran, such reconsideration was necessary to place all of the facts regarding the

identification before the Appeals Court. (Id.).  Judge Hamlin denied the motion by way

of a docket entry, citing without discussion Commonwealth v. Pagan, 73 Mass. App. Ct. 369, 374-76 (2008), and Commonwealth v. Grandison, 433 Mass. 135, 137, 741 N.E.2d 25, 29 (2001).  (SA 8).  In Pagan, there was a lengthy discussion recognizing a judge's power to reconsider a ruling on a motion to suppress.  In Grandison, the court recognized that the denial of a motion to suppress "implies resolution of factual issues in favor of the Commonwealth."  (Quotation and citation omitted).[5]

## The Appeals Court Decision

The Massachusetts Appeals Court addressed Corcoran's direct appeal as well as his appeal from the denial of his renewed motion for a new trial in a single unpublished decision.  Corcoran, 2010 WL 4676187.  With respect to Corcoran's challenge to the motion judge's denial of his motion to suppress, the court recognized that Corcoran was challenging the motion judge's findings of fact based on his contention "that trial testimony by witnesses (who did not testify at the suppression hearing) differed or contradicted that which had been offered at the suppression hearing."  Id. at *1.  Such an

---

[5]  Corcoran argues, without record support, that the motion judge's citation to Grandison was for the proposition that in reviewing a judge's ruling on a motion to suppress, "an appellate court may not rely on the facts as developed at trial even where the testimony differed materially from that given at trial."  (Pet. Mem. at 22 (citing Grandison, 433 Mass. at 137, 741 N.E.2d at 29-30)).  However, on the same page in Grandison, the court also held that the "judge's denial of the defendant's motion to suppress implies resolution of factual issues in favor of the Common-wealth."  Id. at 137, 741 N.E.2d at 30 (internal quotation and citation omitted).  Since the citation to Grandison followed Judge Hamlin's citation to the pages of Commonwealth v. Pagan, which addressed "a judge's power to reconsider his own decisions during the pendency of a case" and contained a lengthy analysis of a motion to reconsider the allowance of a motion to suppress, it is more likely that Judge Hamlin cited Grandison for the latter proposition relating to the meaning of the trial judge's denial of a motion to suppress, rather than for the standard to be followed by an appellate court.  See generally Pagan, 73 Mass. App. Ct. at 374-76, 897 N.E.2d at 1254-55.

objection, however, was "impermissible" since, "[w]hen 'reviewing a judge's ruling on a motion to suppress, an appellate court 'may not rely on the facts as developed at trial' even where the testimony differed materially from that given at trial.'" Id., (quoting Grandison, 433 Mass. at 137, 741 N.E. 2d at 29-30) (additional citations omitted). Moreover, the Appeals Court concluded, Corcoran's "impermissibly claimed factual disparities in suppression hearing findings and trial testimony do not establish that his identification was the product of improper suggestion by the police." Id.

In connection with his appeal from the denial of his renewed motion for a new trial, the Appeals Court again held that "the defendant impermissibly relies on trial testimony to support his claim that the motion judge was wrong." Id. However, the Appeals Court went on to address the merits of Corcoran's claim. Even accepting, arguendo, Corcoran's argument that Kellie did not have two adequate opportunities to observe the suspect, the Appeals Court nevertheless concluded that suppression was not appropriate. As the court ruled,

> "The question raised by a motion to suppress identification testimony is not whether the witness might have been mistaken, but whether any possible mistake was the product of improper suggestions by the police." *Commonwealth v. Watson*, 455 Mass. 246, 251, 915 N.E.2d 1052 (2009). The motion judge found that Officer Macaudda was not conducting a photographic identification procedure when the defendant's Registry of Motor Vehicles (RMV) photograph appeared on the screen of her laptop computer, and the viewing of the photograph by one of the girls standing nearby was accidental. If Quinn was the girl standing nearby, the motion judge found that viewing the RMV photograph did not influence her identification of the defendant in the photographic array, which was found to have been conducted in a fair, appropriate, and

> nonsuggestive manner.  It was not an abuse of discretion for the
> judge to deny the renewed motion for new trial.

Id.

Finally, the Appeals Court rejected Corcoran's contention that counsel was

ineffective for failing to call eyewitnesses to testify at the suppression hearing, or to move

for reconsideration of the denial of the motion to suppress.  Id. at *2.  As an initial matter,

the court found that Corcoran had failed to establish that the decision was not a strategic

one as opposed to a "manifestly unreasonable" one.  Id.  Thus, the court explained,

"counsel could very well have concluded that calling Quinn, who later testified at trial

that she identified the defendant in a photographic array, would not have been helpful.

This is especially true where Quinn also identified what turned out to be defendant's

truck that she saw in the driveway that morning."  Id.  The court also found that Corcoran

had failed to establish any prejudice by the absence of eyewitness testimony at the

suppression hearing, given that Quinn's testimony would undoubtedly have been the

same at the suppression hearing as it was at trial, and Corcoran was "not deprived of a

substantial ground of defense."  Id.

Finally, the Appeals Court concluded that there was "more than sufficient"

evidence to sustain the conviction.  As the court explained:

> Finally, the defendant claims the evidence that someone resembling
> him drove away in his truck was insufficient to support an inference
> that it actually was him at the scene of the crime.  We disagree.  The
> defendant's argument glosses over the trial testimony of Quinn.  In
> the light most favorable to the Commonwealth, Quinn identified the
> defendant's RMV photograph as the man she saw getting into the

truck in the driveway that morning.  Quinn later identified the
defendant's truck at the police station, as well as some of the items it
contained, as the truck she saw on the day in question.  The evidence
identifying the defendant as the man who broke and entered the
Watson home was more than sufficient.

Id.  Therefore, the Appeals Court sustained Corcoran's conviction.

Additional facts will be provided below where appropriate.

### III.   ANALYSIS

#### A.   Standard of Review

The standard of review to be applied to Corcoran's habeas corpus petition is set

forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  The standard allows a federal court to grant a writ of

habeas corpus only if the underlying state court adjudication "(1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In undertaking

this analysis, "a habeas court must determine what arguments or theories supported the

state court's decision, and then it must ask whether it is possible fairminded jurists could

disagree that those arguments or theories are inconsistent with the holding in a prior

decision of [the Supreme] Court."  Wetzel v. Lambert, 132 S. Ct. 1195, 1198, 182 L. Ed.

2d 35 (2012) (quoting Harrington v. Richter, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624

(2011) (internal punctuation omitted)).  Moreover, "[i]n this context, 'clearly established

law' signifies 'the holdings, as opposed to the dicta'" of the Supreme Court decisions.

Howes v. Fields, 132 S. Ct. 1181, 1187, 182 L. Ed. 2d 17 (2012) (quoting Williams v.

Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000)).

A writ of habeas corpus is only appropriate "under the 'contrary to' clause if the

state court applies a rule different from the governing law set forth in [Supreme Court]

cases, or if it decides a case differently than [the Supreme Court has] done on a set of

materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843,

1850, 152 L. Ed. 2d 914 (2002). By contrast, relief is proper "under the 'unreasonable

application' clause if the state court correctly identifies the governing legal principle from

[the Supreme Court] decisions but unreasonably applies it to the facts of the particular

case." Id. An unreasonable application is more than just error, entailing "some increment

of incorrectness beyond error[.]" McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002)

(en banc) (internal quotation and citation omitted); accord Bell, 535 U.S. at 694, 122 S.

Ct. at 1850. The "increment of incorrectness beyond error" "must be great enough to

make the decision unreasonable in the independent and objective judgment of the federal

court." Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011) (quoting McCambridge, 303

F.3d at 36).

With respect to factual findings, "the AEDPA sets out a separate and exacting

standard applicable to review of a state court's factual findings." Pike v. Guarino, 492

F.3d 61, 68 (1st Cir. 2007) (citing, inter alia, 28 U.S.C. § 2254(e)(1)). Thus, there is a

presumption that factual findings by the state court are correct, and the habeas court must

defer to such findings.  <u>Sanna v. Dipaolo</u>, 265 F.3d 1, 10 (1st Cir. 2001).  "[A] habeas petitioner can rebut this presumption by adducing 'clear and convincing evidence'" that convinces the habeas court "that the underlying state court's adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,'  [28 U.S.C.] § 2254(d)(2)."  <u>Id.</u>; <u>see also</u> <u>Teti v. Bender</u>, 507 F.3d 50, 57 (1st Cir. 2007) (petitioner bears the burden of overcoming the presumption of correctness by providing 'clear and convincing evidence' of the error).

Finally, a writ of habeas corpus does not lie for errors of state law.  "Federal habeas is not an ordinary error-correcting writ."  <u>Nadworny v. Fair</u>, 872 F.2d 1093, 1096 (1st Cir. 1989).  Rather, it "exists to rescue those in custody from the failure to apply federal rights, correctly or at all."  <u>Id.</u>  Thus, habeas relief is only available if a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States"; it "does not lie for errors of state law."  <u>Swarthout v. Cooke</u>, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732 (2011) (internal quotations and citations omitted).

Applying these principles to the instant case compels the conclusion that the petition for a writ of habeas corpus should be denied.

### B.    <u>Deference to State Court Decisions</u>

As an initial matter, Corcoran argues that this court should not defer to the state court rulings on his motion to suppress and his renewed motion for a new trial,[6] but, rather, should consider his arguments *de novo*.  As he asserts, given "the failure of the Massachusetts Appeals Court to address, much less analyze, the federal constitutional claims made by petitioner and supported by United States Supreme Court case citations, as well as by case law citations applying Supreme Court precedent, this court's consideration of the constitutional claims should be considered *de novo*."  (Pet. Mem. at 13).  This court disagrees.  In contrast to Corcoran's assertions, the record establishes that the state courts did adjudicate Corcoran's constitutional issues.

Pursuant to  28 U.S.C. § 2254(d), a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings" unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, or (2) was based on an unreasonable determination of the facts.  Thus, "[b]y its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  Harrington v. Richter, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011).  It is well established that "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning[,]" and "a state court need not

---

[6]  While Corcoran appealed from the denial of his original motion for a new trial, he did not raise any issues on appeal relating to that ruling.

cite or even be aware of [Supreme Court] cases under § 2254(d)."  Id.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784-85; see also Lyons v. Brady, 666 F.3d 51, 54 (1st Cir. 2012) (where petitioner raised constitutional argument and state court found "no merit" in the allegations of error, state court is deemed to have adjudicated the constitutional claim and its decision is subject to deferential review).

In the instant case, as Corcoran argues, there is no question that he presented his constitutional claim to the State courts.  It is well established "that a state court may decide a federal constitutional claim 'by reference to state court decisions dealing with federal constitutional issues.'"  Hodge v. Mendonsa, 739 F. 3d 34, 41 (1st Cir. 2013) (quoting DiBenedetto v. Hall, 272 F.3d 1, 6 (1st Cir. 2001)).  Here, the Appeals Court cited Commonwealth v. Watson, 455 Mass. 246, 915 N.E.2d 1052 (2009), which addressed a constitutional challenge to a photographic identification.  See Corcoran, 2010 WL 4676187 at *1.  As the Watson court held, "[f]or a motion to suppress a photographic identification to succeed, 'the defendant must show by a preponderance of the evidence that, in light of the totality of the circumstances, the procedures employed were so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law.'"  Watson, 455 Mass. at 250, 915 N.E.2d at 1052 (quoting Commonwealth v. Miles, 420 Mass. 67, 77, 648 N.E.2d 719 (1995) (additional citations

omitted)).  In addition, the motion judge cited to <u>Commonwealth v. Martin</u>, 447 Mass.

274, 850 N.E.2d 555 (2006) in which the Supreme Judicial Court held that "[i]t is the

defendant's burden to prove by a preponderance of the evidence that the showup was so

unnecessarily suggestive and conducive to irreparable mistaken identification as to deny

him due process of law."  <u>Id.</u> at 279-80, 850 N.E.2d at 560-61 (internal punctuation and

citations omitted).  Thus, the record is clear that the state courts addressed Corcoran's

constitutional arguments, and a deferential standard of review is appropriate.  <u>See</u>

<u>Clements v. Clarke</u>, 592 F.3d 45, 55-56 (1st Cir. 2010) ("When a state court has truly

avoided (or merely overlooked) the petitioner's federal claim, a federal court may step

into the breach and review de novo.  But judicial opacity is a far cry from judicial

avoidance.  It is the result to which we owe deference, not the opinion expounding it.").

### C.    The Scope of the Factual Record

Corcoran also contends that the denial of his motion to suppress was "based on an

unreasonable determination of the facts in light of the evidence presented in the State

Court proceeding."  28 U.S.C. § 2254(d).  However, he does not dispute that Judge

Hamlin's pre-trial findings of fact were based on the testimony of Officer Macaudda and

Detective Hendry at the suppression hearing.  (<u>See</u> SA 262-69 (Commonwealth's brief to

the Appeals Court citing to testimony at the suppression hearing)).  Thus, there is no

support for any claim that the motion judge made findings that were not supported by the

record before her.

Corcoran argues further, however, that Kellie's trial testimony rendered the facts on which the motion judge relied inaccurate, and that the state courts failed to consider the testimony as developed at trial.  (Pet. Mem. at 20).  This assertion also is not supported by the record.  Rather, the record is clear that the trial judge, the motion judge and the Massachusetts Appeals Court all considered the pre-trial identifications of Corcoran by Kellie in light of her trial testimony – they simply did not find the discrepancies between her trial testimony and the testimony at the suppression hearing to be so significant as to require that the pre-trial identifications be suppressed.  (See SA 161-62 (in denying motion for a new trial, trial judge finds that the differences were not as great as Corcoran suggests); SA 8 (in docket entry denying renewed motion for a new trial, motion judge cites Pagan, 73 Mass. App. Ct. at 374-76, 897 N.E.2d at 1255-56, in which the court recognized trial judge's authority to reconsider a ruling on a motion to suppress)).  Corcoran, 2010 WL 4676187, at*1 (upholding denial of motion to suppress even accepting Corcoran's argument that Kellie "did not have two adequate opportunities to observe the suspect").  Consequently, there is no factual support for Corcoran's argument that the findings of fact on which the state courts relied were clearly erronous.[7]

---

[7]  Since, as detailed infra, the motion to suppress was properly denied even accepting Corcoran's description of Kellie's trial testimony, this court will not consider whether there is additional testimony from other witnesses at trial which confirmed the motion judge's original findings of fact.  The absence of such an analysis (which was not done by the parties either), should not be viewed as agreement by this court that Corcoran met his burden of proving that the state courts' findings of fact were unreasonable based on the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d)(2).

Similarly unsupportable is Corcoran's contention that Massachusetts law does not provide for the reconsideration of a motion to suppress if new facts are developed at trial. (See Pet. Mem. at 15 (by her refusal to consider trial testimony, "the hearing judge prevented any sort of appellate review of the identification process which resulted in a denial of due process under the Fourteenth Amendment")).  Admittedly, under Massachusetts law, in reviewing a motion judge's ruling on a motion to suppress, the appellate court considers only the evidence before the motion judge, not the evidence presented at trial.  Commonwealth v. Escalera, 462 Mass. 636, 648-49, 970 N.E.2d 319, 329 (2012) (citing Grandison, 433 Mass. at 137, 741 N.E.2d at 29-30).  This does not, however, preclude any consideration of trial testimony which differs from testimony at the pre-trial motion stage.  Rather, under Massachusetts law, "[a] motion for a new trial under rule 30(b) may include a request to reconsider a ruling on a motion to suppress evidence."  Commonwealth v. Rodriguez, 443 Mass. 707, 709, 823 N.E.2d 1256, 1259 (2005).  This is the procedure that was followed in Corcoran's case.  Thus, there is no factual or legal support for Corcoran's argument that the state courts failed to consider all relevant facts in refusing to suppress the out-of-court identifications.

### D.    The Pre-Trial Identification Procedures

In the instant case, the parties agree that the standard to be applied is defined by a line of cases decided by the United States Supreme Court culminating in Manson v.

<u>Brathwaite</u>, 432 U.S. 98, 110, 113, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).  As has

been explained:

> The Supreme Court has established a two-prong test to determine
> when out-of-court identifications may be admitted into evidence
> against the defendant at trial without violating due process.  *See
> Simmons v. United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d
> 1247 (1968).  *See also United States v. Maguire,* 918 F.2d 254, 263
> (1st Cir.1990).  First, a court must determine whether the out-of-
> court "identification was so impermissibly suggestive as to give rise
> to a very substantial likelihood of irreparable misidentification."
> *Simmons,* 390 U.S. at 384, 88 S. Ct. 967.  The court judges the
> identification's suggestiveness by the "totality of the circumstance"
> of the identification procedure.  *See id.* at 383, 88 S. Ct. 967.
>
> Should a court find that the identification was not suggestive, the
> court's due process inquiry ends.  Should a court find that the
> identification was impermissibly suggestive, however, the court's
> analysis advances to the second prong of the *Simmons* two-prong test
> that looks to the reliability of the challenged identification. *See id.* at
> 385–86, 88 S. Ct. 967.  *See also Manson v. Brathwaite,* 432 U.S. 98,
> 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil v. Biggers,* 409
> U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).  Factors to
> consider when judging the reliability, nevertheless, of a suggestive
> identification are:
>
>> the opportunity of the witness to view the criminal at the time
>> of the crime, the witness' degree of attention, the accuracy of
>> his prior description of the criminal, the level of certainty
>> demonstrated at the confrontation, and the time between the
>> crime and the confrontation.  Against these factors is to be
>> weighed the corrupting effect of the suggestive identification
>> itself.
>
> *Manson,* 432 U.S. at 114, 97 S. Ct. 2243 (citing *Biggers,* 409 U.S. at
> 199–200, 93 S. Ct. 375).  Thus, a suggestive identification may
> nevertheless be admitted against the defendant at trial if a court finds
> that the identification was in fact reliable. *See id. See also United
> States v. de Jesus–Rios,* 990 F.2d 672, 677 (1st Cir.1993); *United*

> *States v. Maguire,* 918 F.2d 254, 263 (1st Cir.1990); *United States v. Bouthot,* 878 F.2d 1506, 1516 (1st Cir.1989).

Edwards v. Murphy, 96 F. Supp. 2d 31, 47 (D. Mass. 2000).  In the instant case, it is undisputed that the state court applied the same standard as federal courts in order to determine if the out-of-court identifications were suggestive.  (See SA 135 (motion judge's Findings of Fact and Rulings of Law)).  Corcoran, 2010 WL 4676187, at *1 (citing Watson, where the court held that "[f]or a motion to suppress a photographic identification to succeed, the defendant must show by a preponderance of the evidence that, in light of the totality of the circumstances, the procedures employed were so unnecessarily suggestive and conducive to irreparable misidentification as to deny the defendant due process of law."  Watson, 455 Mass. at 250, 915 N.E.2d at 1057 (quotations omitted)).  "[T]he standard for the admissibility of an identification under the Massachusetts Constitution is more favorable to a defendant than the standard under the United States Constitution" in that once a defendant establishes that the identification was "unnecessarily suggestive and conducive to irreparable misidentification" under Massachusetts law, it is excluded, and the court does not then address whether the it was otherwise reliable.  Commonwealth v. Walker, 460 Mass. 590, 599 & n.13, 953 N.E.2d 195, 205 & n.13 (2011).

In the instant case, the Massachusetts courts concluded that the initial identification on the computer screen was not unduly suggestive.  Corcoran has not identified any federal cases raising the same factual scenario, and the state courts' rulings are not an

unreasonable application of Federal law.  Here speed in identifying the vehicle was of the

essence, since the truck had just left the premises and could possibly be located promptly.

The police had pulled up a number of different photographs of vehicles and owners

before coming to Corcoran's, and the police did nothing to indicate that the investigation

was focusing on Corcoran.  The identification of Corcoran's photograph was

spontaneous, and occurred shortly after the intruder was seen leaving the premises.[8]  No

one asked the eyewitnesses to identify the photograph on the screen.  Officer Macaudda

immediately turned the computer off once the spontaneous identification was made,

thereby making sure that the witness did not have the opportunity to study or memorize

the photograph.  In evaluating whether a particular confrontation was unnecessarily

suggestive, the court must consider "the totality of the circumstances surrounding it[.]"

Stovall, 388 U.S. at 302, 87 S.Ct. at 1972.  This was the analysis undertaken by the state

courts in the instant case, and Corcoran has not met his burden of establishing that in so

---

[8]  As detailed above, Corcoran takes exception to the motion judge's finding that the
viewing on the computer was "accidental."  However, the testimony on which he relies does not
negate that finding.  Thus, Corcoran points to the witnesses' testimony that they had gone with
Officer Macaudda knowing that she was going to try to trace the license plate they had seen, and
that all three girls were near the cruiser looking in, not just Kellie as the motion judge had found.
(See Pet. Mem. at 16).  However, apart from the number of girls near the cruiser, the motion
judge's description of events is similar in all critical respects.  Corcoran does not challenge the
fact that the Officer was trying to identify the truck, not an individual, or that she did not indicate
in any way to the girls that they should try to identify the intruder from RMV photographs of
vehicle owners.  Nor does he challenge the fact that the Officer had no prior knowledge that the
person whose photograph was going to be called up on the computer was likely to be the
intruder, or that the Officer was conducting her research so that the photographs remained on the
screen for only moments.  These facts all support the motion judge's characterization of the
identification as "accidental."

concluding the state court decisions involved an unreasonable application of clearly established Federal law.  See Id. (bringing a single suspect to hospital room so that a seriously injured victim could identify him was not a due process violation under the circumstances); Simmons v. United States, 390 U.S. 377, 384-85, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968) (photographic array of possible bank robbers upheld even though defendants appeared several times in the arrays where "[i]t was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces[.]").

Even if the initial viewing was unduly suggestive, it had sufficient indicia of reliability so that its admissibility was not contrary to Federal law.  Applying the Manson v. Brathwaite factors of reliability quoted above, even assuming that the witness' ability to view the intruder was not as lengthy as found by the motion judge, the physical layout of the premises was such that she did have the opportunity to see the intruder.  The girls were trying to determine if someone was in the house, so while they may have been scared, there is no evidence that they were not paying attention to identifying the intruder. Kellie was able to give a description of the intruder prior to viewing any photograph, and while she was not certain of her identification of the photograph, she did not hesitate in making it.  Moreover, Kellie's identification was spontaneous and took place shortly after the incident.  The police did nothing to suggest that the photograph was that of the intruder.  Weighing these factors against "the corrupting effect of the suggestive identification itself" supports a finding that the identification of Corcoran was sufficiently

reliable so that its admissibility did not violate his constitutional rights.  See Brathwaite, 432 U.S. at 114, 92 S. Ct. at 2253.

Similarly, Corcoran has not met his burden of proving that the admission of Kellie's selection of his photograph from the photo array violated his constitutional rights.  There is ample support for the conclusion that the array was not suggestive. Further, even if it was suggestive, there was sufficient indicia of reliability to support the decision to admit the identification.

The men depicted in the eight photographs were sufficiently similar so as to constitute a valid array.  (See SA 33).  The photographs were all black and white, and there was no indication that Corcoran's was from the Registry of Motor Vehicles. Detective Hendry reviewed all the advisements with Kellie before she viewed the photographs, making it clear, among other things, that the suspect may not be included in the array.  Other courts facing the same circumstances have found that the photo array was not unduly suggestive.  As the court held in United States v. Vaccaro, 445 F. Supp. 2d 82 (D. Mass. 2006):

> Here, officers conducting the investigation took the necessary steps
> to ensure the absence of suggestiveness in the photo array at issue.
> The officers' photo array included eight photos, one of the defendant
> and seven other photos of men who share the same physical
> characteristics of the defendant (e.g., race, age, hair color and facial
> hair (mustache)). The photos were arranged four on top and four on
> the bottom. No picture was emphasized more than the others and
> several photos were cropped for purposes of creating uniformity in
> photo size. All photos were presented in black-and-white. The
> officers conducted the identification procedure with each witness
> separately. They read detailed instructions to each witness prior to

showing them the array. Those instructions noted that 1) the
suspect's photo was not necessarily included in the array and 2) the
witness was not required, nor should feel an obligation, to choose
any of the photos in the array.

Id. at 86.  See also United States v. Brennick, 405 F.3d 96, 100 (1st Cir. 2005) (challenge

to photo identification fails where "there is a high degree of similarity among the eight

men depicted, as well as among the eight photographs" and the "array does not in any

way draw suggestive attention to [the defendant]").  Similarly, in the instant case, the

finding that the photo array was not unduly suggestive is amply supported by the record.

Corcoran's principal argument in support of his contention that the photo array

was unduly suggestive is his objection to the fact that Kellie had seen the photograph

before.  However, he has not refuted the motion judge's finding that Kellie's identifica-

tion of the photograph was based on her observations at the time of the incident, and not

due to her having viewed the photograph previously.  (SA 134-35).  This finding is amply

supported by the record.  There is no evidence that Officer Hendry indicated to Kellie

that the array included a photograph she had seen before.  The photographs all looked

very similar.  Moreover, the fact that Kellie had spent the afternoon at an amusement park

with all of her classmates, presumably thinking of other things, would negate any

lingering memory she may have had of the glimpse of the RMV photograph hours earlier.

Finally, courts have consistently recognized that the mere fact that a witness had seen the

suspect's photograph before does not make its inclusion in a subsequent array suggestive.

See Watson, 455 Mass at 255, 915 N.E.2d at 1060, and cases cited; Commonwealth v.

Dinkins, 415 Mass. 715, 721, 615 N.E.2d 570, 573 (1993) (not improper to include same photograph in successive photo arrays).[9]

Out-of court identifications "should be suppressed as a matter of due process only in extraordinary cases." United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006) (citation omitted). The challenges made by Corcoran go to the strength of Kellie's identification, and not its admissibility. The jury heard from Kellie that she was not positive about her pre-trial identifications, and she was not positive that the defendant in the courtroom was the intruder. This matter was fully explored by defense counsel. "When the conviction is based on eyewitness identification at trial following a pretrial identification by photograph, [the court] will reverse on a constitutional basis only if the very substantial likelihood of misidentification was irreparable, despite the defendant's opportunity to cross-examine the witness about the accuracy of the identification." Id. Here there was ample opportunity for cross-examination. Nevertheless, the jury convicted Corcoran. As detailed above, in addition to the identification of Corcoran himself, there was eye-witness identification of his truck and items in the truck. There was sufficient evidence to support Corcoran's conviction. He has not met his burden of establishing a violation of his constitutional rights.

## IV.  CONCLUSION

---

[9] While Corcoran notes that Kellie started to describe her identification of him at the photo array as being "the same person I had seen on the police cruiser's screen," he does not expand on this argument. (See Pet Mem. at 9; SA 660). This court also does not find this testimony significant. It does not contradict her testimony that the man on the computer screen and the man in the photo array was the same person she saw leaving the house.

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Corcoran's habeas petition be DENIED.[10]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[10] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).